UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**     'O'

| Case No. | 2:16-cr-00833-CAS | Date | July 3, 2017 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | Jake Nare, Not Present<br>Lawrence Middleton, Not Present<br>Lana Morton-Owens, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1) CESAR ALEJANDRO CASTILLO FLORES | NOT | X | | 1) PEDRO CASTILLO, DFPD | NOT | X | |
| 2) MANUEL ALEC MORENO | NOT | X | | 2) YOLANDA BARRERA | NOT | X | |

**Proceedings:** (IN CHAMBERS) - FLORES'S MOTION TO SUPPRESS EVIDENCE (Filed March 13, 2017, dkt. 35)

MORENO'S MOTION TO SUPPRESS EVIDENCE (Filed March 13, 2017, dkt. 38)

DEFENDANTS' EX PARTE APPLICATION FOR AN ORDER PRECLUDING DEPUTY HOSLET FROM TESTIFYING DURING THE SUPPRESSION HEARING (Filed June 23, 2017, dkt. 150)

### I. INTRODUCTION AND PROCEDURAL HISTORY

On October 11, 2016, Los Angeles County Sheriff's Department ("LASD") Deputy James Peterson initiated a traffic stop. Cesar Flores and Manuel Moreno (collectively "defendants") were in the stopped car. Peterson's traffic stop led to a search of defendants' vehicle and the search uncovered a backpack containing alleged narcotics.

On November 29, 2016, the Government filed a criminal complaint against defendants. Dkt. 1. On December 16, 2016, a grand jury returned a three-count indictment against defendants. Dkt. 12 ("the Indictment"). The Indictment alleges that on or about October 11, 2016, Flores and Moreno: (1) conspired to possess methamphetamine with intent to distribute it, in violation of 21 U.S.C. § 846; (2) possessed, or aided and abetted possession, with intent to distribute methamphetamine, in

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a); and (3) possessed, or aided and abetted possession of, a firearm in the furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 2(a).

On March 13, 2017, Flores filed a motion to suppress evidence derived from the traffic stop, including some of his own statements. Dkt. 35. On the same day, Moreno filed an analogous motion. Dkt. 38. On March 20, 2017, the Government filed an opposition, dkt. 42, a declaration by James Peterson, dkt. 42-1, and a declaration by Jake Nare, an Assistant United States Attorney assigned to this case, dkt. 42-2. On March 26, 2017, Moreno filed a reply. Dkt. 44. The next day, Flores filed a reply. Dkt. 45. The Government has since filed two supplemental memoranda in opposition, dkts. 86 & 111, and defendants have filed two supplemental reply memoranda, dkts. 87& 114.

Between April 10, 2017, and June 26, 2017, the Court repeatedly continued the evidentiary hearing for defendants' motions to suppress while the parties' litigated other motions relating to discovery and whether two Assistant United States Attorneys should be compelled to testify at the suppression hearing.

On May 30, 2017, the Government filed a memorandum stating that the Court should decide the motions to suppress without testimony by Peterson, the arresting officer who stopped defendants' vehicle. Dkt. 132. The Government indicated that it would not call Peterson as a witness during the suppression hearing and would no longer rely upon Peterson's declaration, dkt. 42-1. <u>Id.</u> On June 5, 2017, the Government filed a declaration by Steven Casaus in opposition to defendants' motions to suppress. Dkt. 138.

On June 23, 2017, defendants filed an ex parte application for an order precluding Deputy Jeffrey Hoslet from testifying during the suppression hearing. Dkt. 150.

On June 27, 2017, the Court held a suppression hearing. The Government confirmed that it would not call Peterson to testify regarding the traffic stop. The Court notified the parties of its tentative finding that the patrol car video was not an adequate basis for the initial traffic stop. The parties agreed that such a finding would obviate the need for additional evidence about the remainder of the stop. The Court stated that, even if the Court ruled that Peterson's initial traffic stop was unjustified, it would permit both sides to call their witnesses and fully develop the record relating to the search after the initial traffic stop. The Court reviewed the video again during the hearing and heard argument regarding its contents. The Court ruled that the patrol car video was not an adequate basis for the initial traffic stop. In light of the Court's ruling, the Government

elected to rest rather than present its evidence regarding the subsequent roadside search of defendants' vehicle. [1]

The Court orally **GRANTED** defendants' motions to suppress during the suppression hearing, but provides the following statement of reasons in support of the Court's oral ruling.

## II.    BACKGROUND

On October 11, 2016, Deputy James Peterson was patrolling in the northbound lanes of the I-5.[2]  Flores was also driving in the northbound lanes of the I-5 with Moreno as his passenger.  Flores was driving a black Toyota 4 Runner ("the Vehicle").  Peterson ultimately stopped defendants' vehicle by activating his patrol car's rooftop lights and signaling the Vehicle to pull over to the right shoulder.  The Government contends that defendants were speeding.  The speed limit in that section of the I-5 was 65 miles per hour.

A camera facing forward on Peterson's patrol car dash recorded Peterson stopping the Vehicle.  It also recorded the thirty seconds before Peterson activated the patrol car's rooftop lights and initiated the traffic stop.  The parties have lodged a copy of the video recording taken by Peterson's patrol car ("the Video").[3]

---

[1] Deputy Hoslet is a dog handler who responded to assist Peterson during the traffic stop by searching the vehicle using a narcotics-detecting dog.  The Government elected not to call Deputy Hoslet as a witness during the suppression hearing.  Accordingly, defendants' ex parte application is **DENIED as moot.**

[2] This case presents a unique situation – the Government has disclaimed any reliance upon statements by Peterson, including a declaration that contains much of the background information about the October 11, 2016 traffic stop and Peterson's police report.  In light of the Government's position, the Court will not rely upon Peterson's declaration for any disputed facts; however, the parties appear to agree to certain background facts such as, for example, where the traffic stop in this case occurred and the speed limit in that area of the I-5.

[3] As noted above, the Government contends that the first thirty seconds of video footage demonstrate that Peterson had an adequate basis for conducting a traffic stop of defendants' Vehicle without any additional evidence.  Accordingly, the Court will describe the content of the video in detail.

As soon as the Video begins, four seconds into the video file, it depicts Peterson's patrol car in the leftmost lane (lane number one) and the Vehicle approximately ten feet in front of Peterson's patrol car in the lane to Peterson's right (lane number two). [4]

Eight seconds into the recording, an information display appears overlaid on top of the Video. The display shows the date, time, and what appears to be the speed of Peterson's patrol car as measured by a global positioning system ("GPS") device. The earliest time depicted in the video is 7:56:05 p.m..[5] According to the GPS information contained in the Video, Peterson's patrol car was traveling 61 miles per hour.[6]



During the first eight seconds of the recording (ending at 7:56:09 p.m.) the Vehicle was traveling very slightly faster than Peterson's patrol car while the GPS speed display

---

[4] It is difficult to discern distances from the video without percipient witness testimony. However, because the Government's argument rests in part upon the relative distance between the patrol car and the Vehicle, the Court estimates the distances here.

[5] For purposes of this order, the Court adopts the time display in the Video.

[6] Neither party has offered evidence or made any representations about the accuracy of the GPS speed display in the video, what it is measuring, or whether it is subject to any material delay. Because the speed display skips numbers, it does not appear to provide a fluid, continuous measure of Peterson's speed. The GPS number appears to change approximately every two seconds. When Peterson engaged his brakes at 7:56:20 p.m., there was a delay before the GPS measurement decreased, suggesting there is a delay in the GPS-speed measurement overlaid onto the Video.

showed Peterson traveling either 61 or 62 miles per hour. At 7:56:09 p.m., the distance between the patrol car and the Vehicle was between 20 and 30 feet. At 7:56:09 p.m., the Vehicle moved close to the dividing line between lane two and lane three, but the Vehicle's tires did not cross over the dividing line.[7]

From 7:56:10 p.m. to 7:56:16 p.m., according to the GPS display, Peterson was travelling approximately 64 miles per hours. The distance between Peterson's patrol car and the Vehicle remained approximately the same.

At 7:56:16 p.m., Flores engaged the Vehicle brakes while Peterson simultaneously sped up. Between 7:56:16 p.m. and 7:56:20 p.m., Peterson's speed increased from 64 miles per hour, to 66, to 69, and finally 73 miles per hour. While Peterson's patrol car sped up and the Vehicle tapped its brakes, the distance between the two vehicles narrowed substantially. At 7:56:20 p.m., the video display shows "Brakes," evidently indicating that Peterson engaged the patrol car brakes.[8] From 7:56:20 p.m. to 7:56:24 p.m., Peterson's speed decreased from a peak of 73 miles per hour while Peterson's. At 7:56:22 p.m., Peterson's speed was 71 miles per hour. At 7:56:24, it was 67 miles per hour and the distance between the patrol car and the Vehicle was less than ten feet. Peterson began to maneuver his patrol car into lane number two, behind the Vehicle. At 7:56:26 p.m., Peterson's patrol car was travelling at 65 miles per hour and straddling the line dividing lanes one and two. At 7:56:28 p.m., Peterson's patrol car was in lane number two behind the Vehicle and the GPS display states that Peterson's patrol car was traveling 66 miles per hour.

Throughout the initial thirty seconds of the Video, the Vehicle was slowly approaching a large tanker truck in the third lane from the left (lane number three). At 7:56:05 p.m., the tanker truck appeared to be between 50 and 100 feet in front of the Vehicle. At 7:56:26 p.m., the Vehicle's front bumper overtook the rear bumper of the tanker truck in lane number three. Between 7:56:26 p.m. and 7:56:30 p.m., the Vehicle began to pass the tanker truck on its right.

---

[7] During the Video, the vehicle remained close to the dividing line between lane two and lane three, but at no time does the video show the Vehicle's tires crossing, or touching, the dividing line between lanes two and three.

[8] The Court assumes that the "Brakes" display indicates Peterson's patrol car engaged its brakes – neither party has presented evidence or made any representations regarding the display's accuracy.

At 7:56:30 p.m., Peterson triggered his patrol car lights from behind the Vehicle and initiated the traffic stop. The Vehicle was adjacent to the tanker truck.[9]

## III. DISCUSSION

Defendants argue that Peterson violated their Fourth Amendment rights by, among other things, stopping their Vehicle at all.[10] The Government argues that Peterson was justified in stopping the Vehicle because the Vehicle was speeding.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809–10 (1996). Where the Government seeks to justify a traffic stop incident to a traffic violation, the Government must demonstrate that the law enforcement official initiating the stop had, at least, "reasonable suspicion" that a traffic violation had occurred. United States v. Lopez-Soto, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Id. at 1105 (internal quotation marks and citation omitted). "The reasonable suspicion analysis takes into account the totality of the circumstances," including an officer's inferences and deductions based upon their experience and training United States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir.2006). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."[11] United States v. Arvizu, 534 U.S. 266, 274 (2002). However, an "'inchoate

---

[9] The tanker truck had at least five axles and was therefore subject to a statewide maximum speed limit of 55 miles per hour. Cal. Veh. Code § 22406.

[10] Defendants challenge several aspects of the traffic stop and subsequent search of their vehicle. Because the Court finds that the initial traffic stop violated the defendants' Fourth Amendment rights, the Court does not reach the parties' arguments regarding the subsequent investigation and search of the Vehicle.

[11] During the suppression hearing the parties discussed the Government's burden and whether Peterson was required to have probable cause or reasonable suspicion of a traffic violation. In at least one circuit, courts distinguish between the two standards by

and unparticularized suspicion or 'hunch'' cannot withstand scrutiny under the Fourth Amendment." United States v. Chavez-Valenzuela, 268 F.3d 719, 724 (9th Cir. 2001),

examining what type of crime or violation was suspected. In the Sixth Circuit a traffic stop must be supported by one of the following levels of suspicion:

(1) reasonable suspicion of an ongoing crime (misdemeanor or felony);
(2) reasonable suspicion of a completed felony;
(3) probable cause that a completed misdemeanor has occurred; or
(4) *probable cause that a traffic violation has occurred*.

See Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004) (emphasis added). Gaddis has been favorably cited in this circuit for its balancing of the nature of the offense against the level of requisite suspicion to justify a traffic stop. See United States v. Grigg, 498 F.3d 1070, 1076 (9th Cir. 2007).

In Lopez-Soto, the Ninth Circuit adopted the "reasonable suspicion" standard for traffic stops. The suspected traffic violation was ongoing and minor and the Lopez-Soto court did not distinguish between completed traffic violations and ongoing traffic violations or examine the dangerousness of the suspected conduct. Instead, the court ruled simply that "the Fourth Amendment requires only reasonable suspicion *in the context of* investigative traffic stops." Id. at 1105 (emphasis added).

In Grigg, the Ninth Circuit declined to adopt any *per se* standard regarding the requisite suspicion in relation to various offenses. Instead, the Grigg court noted simply, "a court reviewing the reasonableness of an investigative stop must consider the nature of the offense, with particular attention to any inherent threat to public safety associated with the suspected past violation." Grigg, 498 F.3d at 1080. In light of the foregoing, it is unclear to what extent the holding in Grigg may have altered the "reasonable suspicion" standard adopted in Lopez-Soto or to what extent Lopez-Soto's holding was meant to apply to all suspected traffic infractions.

The Court notes this ambiguity in the Circuit's precedent because the purported traffic violation in this case was both minor and ephemeral – the Government argues that for a matter of seconds, and perhaps less, defendants' Vehicle traveled just above 65 miles per hour. Under the circumstances of this case, and in light of Gaddis, the Court would find a higher standard appropriate than reasonable suspicion to render a stop for speeding just above the speed limit reasonable. The Court need not decide here whether deviation from Lopez-Soto's holding is permissible or appropriate; the Government failed to meet the lower burden of reasonable suspicion.

amended, 279 F.3d 1062 (9th Cir. 2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  Nor may an officer make a traffic stop "based on mere whim."  United States v. Valdes-Vega, 738 F.3d 1074, 1080 (9th Cir. 2013).

There was only one percipient law enforcement witness to the moments preceding the traffic stop at issue in this case, Deputy Peterson.  The Government has disclosed evidence that Peterson made inconsistent statements about a traffic stop in at least one other case, see dkt. 115, and possibly two, see dkt. 145.  As described in more detail in the Court's May 8, 2017, and June 13, 2017 orders, the LASD Internal Criminal Investigations Bureau, LASD Internal Affairs Bureau, and Los Angeles County District Attorney's Office have all investigated whether Peterson lied to federal prosecutors about obtaining consent to search a vehicle in a prior case.  None of those investigations determined that Peterson lied.  Nonetheless, the Government has previously dismissed three cases for reasons relating to Deputy Peterson's conduct during traffic stops.  See dkts. 115, 145.  For reasons it has not explained here, but presumably relating to the foregoing history, the Government has elected not to rely upon Peterson's police report, declaration, or testimony in this case.  Instead, the Government has elected to attempt to prove reasonable suspicion justifying the traffic stop by other means.  It has failed to do so.

As an initial matter, the Video simply does not show defendants' Vehicle speeding.  During the suppression hearing, the Government argued that the Vehicle could be observed speeding twice during the thirty seconds of Video preceding the stop.  The Government argues that "[a]pproximately 16 seconds into the video, Deputy Peterson is going 64 miles an hour and the defendants are extending the distance between them."[12] Hearing Transcript 5:24-6:1.  The Government contends that during these seconds, "there is decent evidence" that the Vehicle exceeded 65 miles per hour, "particularly under the reasonable suspicion standard."[13]  Id. at 6:1-3.  The Government further directs the

---

[12] The Government appears to be referring to the period from 7:56:10 p.m. to 7:56:16 p.m.

[13] The Video *does* depicts the Vehicle traveling at or near the speed limit.  However, to the extent the Government implies that Peterson could have stopped the Vehicle merely because its speed was *near* the speed limit, the Court rejects such a proposition.  Such a stop would be based on little more than an impermissible hunch.  See Sokolow, 490 U.S. at 7 (1989).  The courts have never permitted traffic stops based solely upon observations that would "sweep many ordinary citizens into a generality of suspicious appearance," and thus permit broad swathes of law-abiding citizens to be stopped.  United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000); see

Court's attention to the period from "seconds 25 through 33."[14] Id. at 6:4.  During this second period of seconds, the Government argues:

> Deputy Peterson is going between 66 and 71 miles per hour as he is riding along with them.  They are not bumper-to-bumper for a long period of time, but they are bumper-to-bumper in that time period.  And anything over 65 miles per hour is enough.

Id. at 6:11-15.  Neither period shows the Vehicle speeding.

Between 7:56:10 p.m. and 7:56:16 p.m., while the video display says Peterson was traveling 64 miles per hour, the distance between the patrol car and the Vehicle does not meaningfully change.  At 7:56:10, the Vehicle appears to have been between 20 and 30 feet in front of Peterson's patrol car.  Six seconds later, it had barely moved in relation to Peterson's patrol car.  Although it is difficult to discern the relative distances from the video, a vehicle driving at least 2 miles per hour faster than Peterson should have extended the distance between both vehicles by at least 17.6 feet.  Any minor difference in the vehicles' relative speeds plainly did not extend the distance between the two cars by that much.

Between 7:56:22 p.m. and 7:56:30 p.m., Peterson's patrol car speed was constantly changing while he engaged his brakes and maneuvered into the Vehicle's lane.  The GPS speed display changes every 2 seconds, decreasing to 65 miles per hour and then increasing to 66 miles per hour in the two seconds before Peterson activated his patrol car lights.  Additionally, the relative positions of the patrol car and the Vehicle are changing.  Insofar as the GPS display of the video states that Peterson's patrol car slowed from 71 to 65 miles per hour over the course of the four seconds from 7:56:22 p.m. to 7:56:26 p.m., it is unclear how the intervening speeds might reflect upon the speed of the Vehicle, which appears to be moving at a constant rate relative to the adjacent truck tanker.  Contrary to the Government's assertion, the GPS speed display and the relative positions

---

also United States v. Flores, 798 F.3d 645, 649 (7th Cir. 2015) ("A suspicion so broad that would permit the police to stop a substantial portion of the lawfully driving public . . . is not reasonable.") (Posner, J.).  Thus, an officer's suspicion that a vehicle is traveling *around* the speed limit – and therefore, perhaps, exceeding it – cannot justify a seizure within the meaning of the Fourth Amendment.

[14] The Government appears to be referring to the period from 7:56:22 p.m. until Peterson activated his patrol car lights.

of the patrol car and the Vehicle during these moments do not support an inference that the Vehicle was traveling in excess of 65 miles per hour beyond bare speculation.

Even if the Video *did* depict the Vehicle's speed exceeding 65 miles per hour based upon a GPS measure of Peterson's patrol car speed, which it does not, such a finding would not support reasonable suspicion justifying the traffic stop. If a law enforcement officer has been trained in a method of measuring another vehicle's speed, the officer's use of that method might support a reasonable suspicion that another vehicle is speeding. See e.g. United States v. Sandoval, Case No. 2:11-cv-00189-GEB, 2012 WL 1901302, at *3 (E.D. Cal. May 24, 2012) (wherein the Government presented evidence that an officer used a standard technique, matched the suspect vehicle's speed over time, monitored his own speedometer, and measured the suspect's speed as 71 miles per hour in a 65 mile per hour zone). However, there is nothing to suggest in this case that Peterson intended to match and measure the Vehicle's speed using a technique in which he was trained or which he had previously used. Nor has the Government offered evidence that an officer's training or experience would enable him to draw a reasonable inference about another vehicle's speed to within a fraction of a mile per hour based only upon viewing that vehicle from behind for one or two seconds. Accordingly, the Court declines to draw such an inference.

More fundamentally, the Government has not connected what the Video depicts to what Peterson observed prior to stopping the defendants. At bottom, the Government argues that if Peterson had seen the Video, he (or perhaps any officer) would have had reasonable suspicion to stop defendants because of the GPS display. However, "[i]t is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause." Arizona v. Evans, 514 U.S. 1, 17 (1995). The Government cannot prove reasonable suspicion by developing *new* evidence of a traffic violation of which no one was aware at the time. Nor can it prove reasonable suspicion by relying upon information that was not known or communicated to the officer conducting the stop. United States v. Blair, 524 F.3d 740, 751 (6th Cir. 2008). The Government must prove that "*the detaining officer* ha[d] a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273. Thus, even if the GPS speed in the Video is credited and would support a finding that defendants were, in fact, speeding, the Government must prove that someone perceived that speeding at the time. The Government has not attempted to meet that burden and there is no evidence Peterson was closely scrutinizing defendants' speed during the seconds of video upon which the Government relies.

The only evidence before the Court regarding *Peterson's* suspicions is Peterson's behavior depicted in the Video. However, that behavior only reinforces the Court's

ruling that he did not perceive any speeding.  At 7:56:16 p.m., Peterson suddenly sped up.  Seconds later, he just as dramatically slowed down right behind the Vehicle.  Based upon the Video, Peterson appears to have already decided to make a traffic stop by 7:56:16 p.m., when he sped up, because, as soon as he caught up to the Vehicle, he changed lanes and initiated his patrol car rooftop lights.  In that context, it is unlikely Peterson was *also* staring closely at his speedometer to estimate whether his own vehicle was traveling in excess of the speed limit, let alone extrapolating from his own speed to the Vehicle's.  Furthermore, the *tanker truck* in lane three *was* speeding – its speed limit was ten miles per hour slower than the surrounding traffic.  If Peterson were paying attention to the vehicles relative speeds during the thirty seconds of the Video, he would have had a far stronger basis for stopping the tanker truck.  Therefore, whatever reasonable suspicion Peterson may have had for stopping defendants, he appears to have decided to make the traffic stop for reasons unrelated to defendants' speed between 7:56:16 p.m. and 7:56:30 p.m. – the period of the Video upon which the Government relies.  Ultimately, during the critical seconds in which the Government contends that the Vehicle *may* have exceeded 65 miles per hour, the Court doubts Peterson would have been paying attention to his speedometer – he was accelerating, traveling at a high speed, changing lanes in very close proximity to defendants' Vehicle, adjacent to a tanker truck, and preparing to initiate a traffic stop seconds later.

The Government's argument in opposition to defendants' motions to suppress rests upon several layers of speculation about how the Video compares to what Peterson may have perceived about another vehicle's speed during a few seconds in which Peterson was simultaneously doing other things.  The Court declines to speculate about what suspicions Peterson may or may not have had about defendants' speed.  By failing to call any witness who, themselves, had reasonable suspicion to stop defendants' Vehicle, the Government has failed to meet its burden.  See United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976) (the district court properly granted a motion to suppress where the Government chose not to call a police dispatcher who had reasonable suspicion and instead called a different witness who, themselves, lacked reasonable suspicion).  Even if Peterson saw exactly what the Video depicts, including his own speed, it would not support a reasonable inference that the Vehicle was speeding - it would only have provided Peterson with a hunch.  A seizure based upon a hunch, without more, is unreasonable.  Sokolow, 490 U.S. at 7 (1989).

The Government has not proven that Deputy Peterson had reasonable suspicion permitting him to stop defendants' Vehicle.  The motions to suppress are **GRANTED**

## V. CONCLUSION

Defendants' motions to suppress are **GRANTED**.

IT IS SO ORDERED.

|  | 00 | 00 |
|---|---|---|
| Initials of Deputy Clerk | | CMJ |